# Exhibit E

throughs.[3] This order extends this *de minimis* exemption.

The ITS Plan system is an order routing network designed to facilitate intermarket trading in exchange-listed securities among participating SROs based on current quotation information emanating from their markets. Quotations in exchange-listed securities are collected and disseminated by the Consolidated Quote System ("CQS"), which is governed by a national market system plan that the Commission has approved pursuant to Rule 11Aa3–2 under the Act.[4] Under the ITS Plan, a member of a participating SRO may access the best bid or offer displayed in CQS by another Participant by sending an order (a "commitment to trade") through ITS to that Participant. Exchange members participate in ITS through facilities provided by their respective exchanges. NASD members participate in ITS through a facility of the Nasdaq Stock Market ("Nasdaq") known as the Computer Assisted Execution System ("CAES"). Market makers and electronic communications networks ("ECNs") that are members of the NASD and seek to display their quotes in exchange-listed securities through Nasdaq must register with the NASD as ITS/CAES Market Makers.[5]

The Commission's August 2002 order granted a *de minimis* exemption from compliance with Section 8(d)(i) of the ITS Plan with respect to three specific exchange-traded funds ("ETFs"), the Nasdaq-100 Index ETF ("QQQ"), the Dow Jones Industrial Average ETF ("DIA"), and the Standard & Poor's 500 Index ETF ("SPY").[6] Section 8(d)(i) of the ITS Plan provides that participants should not purchase or sell any security that trades on the ITS Plan system at a price that is worse than the price at which that security is otherwise being offered on the ITS Plan system.[7] By its terms, the Commission's order exempts from the trade-through provisions of the ITS Plan any transactions in the three ETFs that are effected at prices at or within three cents away from the best bid and offer quoted in the CQS for a period of nine months, which ends on June 4, 2003.

The three cent *de minimis* exemption allows ITS participants and their members to execute transactions, through automated execution or otherwise, without attempting to access the quotes of other participants when the expected price improvement would not be significant. In providing the three cent *de minimis* exemption, the Commission believed that, on balance, exempting the specified transactions from the ITS trade-through provisions would provide investors increased liquidity and expand the choice of execution venues, while limiting the possibility that investors would receive significantly inferior prices.

The Commission granted the three cent *de minimis* exemption on a temporary, nine-month basis, in order to gather the data necessary to study the effects of an exemption from the ITS trade-through provisions and the desirability of extending the exemption. The Commission is currently assessing trading data associated with the *de minimis* exemption, and over the next nine-months intends to consider whether to adopt the *de minimis* exemption on a permanent basis, to adopt some other alternative solution, or to allow the exemption to expire.

In view of the foregoing, the Commission believes that an extension of the *de minimis* exemption for an additional nine-month period is consistent with the public interest, the protection of investors, the maintenance of fair and orderly markets and the removal of impediments to, and perfection of the mechanisms of, a national market system. The Commission emphasizes, as it did in its August 2002 order, that the *de minimis* exemption does not relieve brokers and dealers of their best execution obligations under the federal securities laws and SRO rules.

Accordingly, *it is ordered*, pursuant to Section 11A of the Act and Rule 11Aa3–2(f) thereunder,[8] that participants of the ITS Plan and their members are hereby exempt from Section 8(d) of the ITS Plan during the period covered by this Order with respect to transactions in QQQs, DIAs, and SPYs that are executed at a price that is no more than three cents lower than the highest bid displayed in CQS and no more than three cents higher than the lowest offer displayed in CQS. This Order extends the *de minimis* exemption from June 4, 2003 through March 4, 2004.

By the Commission.

Margaret H. McFarland,
*Deputy Secretary.*
[FR Doc. 03–14113 Filed 6–4–03; 8:45 am]
BILLING CODE 8010-01-P

---

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–47948; File No. SR–CBOE–2003–19]

### Self-Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by the Chicago Board Options Exchange, Inc. To Reinstate the Imposition of a Marketing Fee

Pursuant to section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on May 13, 2003, the Chicago Board Options Exchange, Inc. ("CBOE") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I, II and III below, which Items have been prepared by the CBOE. The CBOE has designated this proposal as one establishing or changing a due, fee, or other charge imposed by the CBOE under section 19(b)(3)(A)(ii) of the Act,[3] which renders the proposal effective upon filing with the Commission. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The CBOE proposes to reinstate a marketing fee, which it previously had suspended effective October 1, 2001, to be imposed on certain transactions of market-makers, including Designated Primary Market Makers ("DPMs"), for the purpose of attracting order flow to the CBOE. The fee will be imposed at a rate of $.40 per contract on market-maker transactions, including those of DPMs, in all classes of options in which a DPM has been appointed. The marketing fee will be effective as of June 1, 2003. The text of the proposed rule change is available at the CBOE and at the Commission.

---

[3] *See generally* Securities Exchange Act Release No. 46428, 67 FR 56607 (September 4, 2002).

[4] 17 CFR 240.11Aa3–2.

[5] *See* Securities Exchange Act Release No. 42536 (March 16, 2000), 65 FR 15401 (March 22, 2000). Market Makers and ECNs are required to provide their best-priced quotations and customer limit orders in certain exchange-listed and Nasdaq securities to an SRO for public display under Commission Rule 11Ac1–1 and Regulation ATS. 17 CFR 240.11Ac1–1 and 242.301(b)(3).

[6] The Commission limited the *de minimis* exemption to the three securities because they share certain characteristics that may make immediate execution of their shares highly desirable to certain investors. In particular, trading in the three ETFs is highly liquid and market participants may value an immediate execution at a displayed price more than the opportunity to obtain a slightly better price.

[7] Each ITS participant has adopted a trade-through rule substantially similar to the rule of the ITS Plan. *See* ITS Plan, Section 8(d)(ii); *See, e.g.*, NYSE Rule 15A, NASD Rule 5262.

[8] 17 CFR 240.11Aa3–2(f).

[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.
[3] 15 U.S.C. 78s(b)(3)(A)(ii).

## II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the CBOE included statements concerning the purpose of and basis for its proposal and discussed any comments it had received regarding the proposal. The text of these statements may be examined at the places specified in Item IV below. The CBOE has prepared summaries, set forth in sections A, B and C below, of the most significant aspects of such statements.

### III. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

#### 1. Purpose

Effective August 1, 2001, the CBOE suspended its $.40 per contract marketing fee that was used by the appropriate DPM to attract order flow to the CBOE.[4] The CBOE previously had established its marketing fee effective as of July 1, 2000.[5] At the time the CBOE suspended the assessment of the marketing fee, it expressly noted that it reserved the right to reinstate the marketing fee at a future date if it deemed appropriate, and that it might establish a pre-contract fee different from the former $.40 per contract marketing fee. At the time the CBOE suspended its marketing fee, both the American Stock Exchange and the Philadelphia Stock Exchange also suspended their marketing fee programs. Two other options exchanges (the Pacific Exchange and the International Securities Exchange) continued to impose a marketing fee program for the purpose of attracting order flow to those exchanges. The Philadelphia Stock Exchange has since reinstated its marketing fee program. The CBOE believes that these programs operate to the competitive disadvantage of the CBOE.

The CBOE states that it has determined to reinstate its marketing fee program in a modified form, effective June 1, 2003. The fee will be imposed at a rate of $.40 per contract on market-maker transactions, including those of DPMs, in all classes of options in which a DPM has been appointed as described below. According to the CBOE, this program, like the CBOE's prior marketing fee program, provides for the equitable allocation of a reasonable fee among the CBOE members and is designed to enable the CBOE to compete with other markets in attracting options order flow in multiply traded options from firms that include payment as a factor in their order routing decisions in designated classes of options. However, the CBOE has slightly modified its marketing fee program with the goal of imposing the fee only with respect to those market-maker transactions involving customer orders from firms that accept payment for their orders. Accordingly, the marketing fee will be assessed only on market-maker transactions involving customers of firms that accept payment pursuant to agreements with DPMs.

The CBOE states that it will not have any role with respect to the negotiations between DPMs and payment accepting firms. Rather, the CBOE proposes to pass through to market-makers and DPMs the fee to be collected. In those classes for which a DPM has advised the CBOE that it has negotiated with a payment accepting firm to pay for that firm's order flow, the CBOE will provide administrative support for the program. Specifically, the CBOE asserts that it will keep track of the number of qualified orders each payment accepting firm directs to the CBOE, and make the necessary debits and credits to the accounts of the DPMs, market-makers, and the payment accepting firms to reflect the payments that are to be made. The CBOE represents that all of the funds generated by the fee will be used only to pay the firms for the order flow sent to the CBOE.

The CBOE believes that $.40 per contract is an equitable allocation of a reasonable fee among CBOE members. The CBOE states that it has designed this program to enable it to compete with other markets in attracting options order flow in multiply traded options. If a DPM advises the CBOE that it has negotiated a lower amount, the CBOE will refund to market-makers and DPMs the excess fee collected.

The CBOE states that the marketing fee will be assessed only on transactions of market-makers (including DPMs) resulting from orders for 200 contracts or less from customers of payment accepting firms. In the CBOE's view, because the marketing fee will be passed through only to those market-makers' transactions resulting from orders from customers of a payment accepting firm that the DPM has independently negotiated with to pay for that firm's order flow, there will be a direct and fair correlation between those members who pay the costs of the marketing program funded by the fee and those who receive the benefits of the program.

The CBOE represents that after the marketing fee has been in effect for three months, the members of a particular trading crowd may determine not to participate in this marketing fee program pursuant to the procedures that the CBOE is proposing in a new Interpretation .12 to CBOE Rule 8.7. These procedures are described in a separate proposed rule change, SR–CBOE–2003–20, that the CBOE has filed with the Commission.[6] The CBOE is proposing to institute these procedures as a pilot program, which is to expire one year after the Commission approval.

According to the CBOE, it is important to note that although market-maker transactions resulting from customer orders from firms that do not accept payment for their orders are not subject to the fee, CBOE market-makers will have no way of identifying prior to execution whether a particular order is from a payment-accepting firm, or from a firm that does not accept payment for their order flow.

In connection with any program involving payment for order flow that may be funded by the CBOE's proposed marketing fee, the CBOE will issue appropriate regulatory or educational circulars to its members that emphasize the disclosure and best execution obligations of members who may accept such payment.

#### 2. Statutory Basis

The CBOE believes that because this marketing fee will serve to enhance the competitiveness of the CBOE and its members, this proposal is consistent with and furthers the objectives of the Act, including specifically section 6(b)(5) thereof,[7] which requires the rules of exchanges to be designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, and section 11A(a)(1) thereof,[8] which reflects the finding of Congress that it is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure fair competition among brokers and dealers and among exchange markets. The CBOE also believes that the proposed rule change

---

[4] See Exchange Act Release No. 44717 (August 16, 2001), 66 FR 44655 (August 24, 2001), (SR–CBOE–2001–43).

[5] See Exchange Act Release No. 43112 (August 3, 2000), 65 FR 49040 (August 10, 2000), (SR–CBOE–00–28).

[6] Contemporaneous with the filing of this proposed rule change, CBOE filed SR–CBOE–2003–20, which sets forth the procedures by which a trading crowd may manifest its intention that it does not want to participate in the CBOE's marketing fee program. The CBOE has requested accelerated approval of this proposed rule change as a pilot program.

[7] 15 U.S.C. 78f(b)(5).

[8] 15 U.S.C. 78k–1.

is consistent with section 6(b) of the Act,[9] and furthers the objectives of section 6(b)(4) of the Act[10] in particular, in that it is designed to provide for the equitable allocation of reasonable dues, fees, and other charges among CBOE members.

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The CBOE does not believe that the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants or Others*

The CBOE neither solicited nor received written comments with respect to the proposed rule change.

### III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Because the foregoing rule change establishes or changes a due, fee, or other charge imposed by the CBOE, it has become effective pursuant to section 19(b)(3)(A) of the Act[11] and subparagraph (f) of Rule 19b–4 thereunder.[12] At any time within 60 days after the filing of the proposed rule change, the Commission may summarily abrogate the rule change if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Act.

### IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposal is consistent with the Act. Persons making written submissions should file six copies thereof with the Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for inspection and copying in the Commission's Public Reference Room. Copies of such filing will also be available for inspection and copying at the principal office of the CBOE. All submissions should refer to file number SR–CBOE–2003–19 and should be submitted by June 26, 2003.

For the Commission, by the Division of Market Regulation, pursuant to delegated authority.[13]

Margaret H. McFarland,
*Deputy Secretary.*
[FR Doc. 03–14171 Filed 6–4–03; 8:45 am]
BILLING CODE 8010–01–M

---

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–47941; File No. SR–CSE–2003–05]

**Self-Regulatory Organizations; Notice of Filing and Order Granting Accelerated Approval of Proposed Rule Change by the Cincinnati Stock Exchange, Inc. Relating to an Extension of an Existing Pilot Amending CSE Rule 12.6, Customer Priority, To Require Designated Dealers to Better Customer Orders at the National Best Bid or Offer by Whole Penny Increments**

May 29, 2003.

Pursuant to section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on May 22, 2003, the Cincinnati Stock Exchange, Inc. ("CSE" or "Exchange") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I and II below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons and to grant accelerated approval of the proposed rule change for a pilot period through December 1, 2003.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to extend the termination date of the pilot that amends CSE Rule 12.6, Customer Priority, by adding new Interpretation .02, which requires a CSE Designated Dealer ("Specialist") to better the price of a customer limit order that is held by that Specialist if that Specialist determines to trade with an incoming market or marketable limit order.[3] Under the pilot rule, the Specialist is required to better a customer limit order at the national best bid or offer ("NBBO") by at least one penny and at a price outside the current NBBO by at least the nearest penny increment. The Exchange is requesting an extension of the pilot, and the exemption letters associated therewith.[4] The proposed extension of the pilot requires no changes to the Initial Pilot rule text, which is available at the CSE and at the Commission.

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item III below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

*A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change*

1. Purpose

The Exchange proposes to amend Exchange Rule 12.6[5] by adding an

---

[9] 15 U.S.C. 78f(b).
[10] 15 U.S.C. 78f(b)(4).
[11] 15 U.S.C. 78s(3)(a).
[12] 17 CFR 240.19b–4.

[13] 17 CFR 200.30–3(a)(12).
[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release Nos. 46274 (July 29, 2002), 67 FR 50743 (August 5, 2002) ("Initial Pilot"); 46554 (September 25, 2002), 67 FR 6276 (October 4, 2002) ("Pilot Extension"); and 46929 (November 27, 2002), 67 FR 72711 (December 6, 2002) ("Second Extension").
[4] *See* letter from Robert L.D. Colby, Deputy Director, Division of Market Regulation ("Division"), Commission, to Jeffrey T. Brown, General Counsel, CSE (July 26, 2002) ("Initial Exemption Letter") in response to letter from Jeffrey T. Brown, General Counsel, CSE, to Annette Nazareth, Director, Division, Commission (November 27, 2001) ("Initial Exemption Request"); letter from Robert L.D. Colby, Deputy Director, Division, Commission, to Jeffrey T. Brown, General Counsel, CSE (September 25, 2002) (amending and extending the Initial Exemption Letter) ("Amended Exemption Letter") in response to letter from Jeffrey T. Brown, General Counsel, CSE, to Annette Nazareth, Director, Division, Commission (September 18, 2002) ("Amended Exemption Request"); letter from Alden S. Adkins, Associate Director, Division, Commission, to Jeffrey T. Brown, Senior Vice President & General Counsel, CSE (November 27, 2002) ("Second Exemption Extension Letter") in response to letter from Jeffrey T. Brown, Senior Vice President & General Counsel, CSE, to Annette Nazareth, Director, Division, Commission (November 20, 2002) ("Second Exemption Request").
[5] CSE Rule 12.6 provides, in pertinent part, that no member shall (i) personally buy or initiate the purchase of any security traded on the Exchange for
Continued