**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CITADEL SECURITIES LLC, GROUP ONE TRADING LP, RONIN CAPITAL, LLC, SUSQUEHANNA SECURITIES AND SUSQUEHANNA INVESTMENT GROUP,<br><br>Plaintiffs,<br><br>v.<br><br>CHICAGO BOARD OPTIONS EXCHANGE INCORPORATED, INTERNATIONAL SECURITIES EXCHANGE, LLC, NASDAQ OMX PHLX (f/k/a PHILADELPHIA STOCK EXCHANGE, INC.), NYSE ARCA, INC. (f/k/a PACIFIC EXCHANGE, INC.), NYSE MKT LLC (f/k/a NYSE AMEX LLC, f/k/a AMERICAN STOCK EXCHANGE LLC),<br><br>Defendants. | Case No. 13-cv-05833<br><br>Hon. Robert W. Gettleman |

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

    I.      Plaintiffs Are Required To Exhaust Available Remedies Under The Exchange Act. ..................................................................................................... 3

    II.     The Complaint Is Barred By Absolute Immunity. .............................................. 5

         A.      Defendants' Market-Monitoring Activities Are Regulatory In Nature. ................................................................................................. 5

         B.      The PFOF Programs Fulfill A Regulatory Purpose. ................................ 8

    III.    Plaintiffs' Claims Are Barred By The Exchange Act And The Exchanges' Rules. ............................................................................................ 9

         A.      The Exchange Act's Comprehensive Remedial Structure Precludes Plaintiffs' Common-Law Claims. .......................................... 10

         B.      Plaintiffs' Claims Are Barred By Exchange Rules. ................................ 11

    IV.    Plaintiffs' Common Law Claims Should Be Dismissed. ................................... 12

CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Camosy, Inc. v. River Steel, Inc.*,
624 N.E.2d 894 (Ill. App. Ct. 1993) ................................................................... 14

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ............................................................................ 1

*Cook v. NASD Regulation, Inc.*,
31 F. Supp. 2d 1245 (D. Colo. 1998) .................................................................. 3

*D'Alessio v. NYSE, Inc.*,
258 F.3d 93 (2d Cir. 2001) .............................................................................. 6, 8

*In re Facebook Inc., IPO Sec. & Derivatives Litig.*,
MDL No. 12-2389, 2013 WL 6621024 (S.D.N.Y. Dec. 12, 2013) ................... 7, 9

*In re NYSE Specialists Secs. Litig.*,
503 F.3d 89 (2d Cir. 2007) .............................................................................. 6, 9

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008) ................................................................ 2, 4, 10, 11

*Marquis v. U.S. Sugar Corp.*,
652 F. Supp. 598 (S.D. Fla. 1987) ...................................................................... 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*,
616 F.2d 1363 (5th Cir. 1980) ......................................................................... 3, 5

*Opulent Fund L.P. v. NASDAQ Stock Market, Inc.*,
No. C-078-03683, 2007 WL 3010573 (N.D. Cal. Oct. 12, 2007) ............... 4, 5, 7, 9

*PennMont Sec. v. Frucher*,
586 F.3d 242 (3d Cir. 2009) ............................................................................... 3

*People ex rel. Hartigan v. Candy Club*,
501 N.E.2d 188 (Ill. App. Ct. 1986) ................................................................... 13

*Raintree Homes, Inc. v. Village of Long Grove*,
807 N.E.2d 439 (Ill. 2004) ................................................................................. 14

*Sparta Surgical Corp. v. NASD*,
159 F.3d 1209 (9th Cir. 1998) ..................................................................... 6, 9, 10

*Swirsky v. NASD*,
124 F.3d 59 (1st Cir. 1997) .............................................................................. 4, 5

*Weissman v. NASD, Inc.*,
500 F.3d 1293 (11th Cir. 2007) ...................................................................... 6, 9

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012) ............................................................................. 10

**TABLE OF AUTHORITIES** *(continued)*

**Statutes**                                                                                       **Page(s)**

15 U.S.C. § 78c(a)(2) ................................................................................................... 11

15 U.S.C. § 78s(b)(1) ................................................................................................... 11

15 U.S.C. § 78s(h)(1) ..................................................................................................... 5


**Other Materials**

Concept Release, Competitive Developments in the Options Markets,
    69 Fed. Reg. 6124 (Feb. 9, 2004) ...........................................................................8

Proposed Rule: Amendments to Regulation SHO,
    74 Fed. Reg. 18,042 (Apr. 20, 2009) .......................................................................8

Self-Regulatory Organization; Notice of Filing of Proposed Rule Change by
    NASDAX OMX PHLX, Inc. Relating to Conduct of Business on the Exchange,
    74 Fed. Reg. 59,279 (Nov. 17, 2009). ...................................................................12

Self-Regulatory Organization; Proposed Rule Change,
    43 Fed. Reg. 22,471 (May 25, 1978) ....................................................................12

## INTRODUCTION

As this Court has recognized, the "improper charges" alleged in the Complaint "were the result of the incorrect marking" of orders by the "'Subject Firm.'" D.E. 21 ("Order"). The Complaint alleges that the Exchanges charged PFOF fees in good faith: They "mistakenly believed" that these "incorrectly marked orders" "were part of the PFOF Programs." D.E. 2-1 ("Compl.") ¶ 72; *see also id.* ¶¶ 36-41. Plaintiffs also allege that the Exchanges operated as intermediaries, collecting PFOF fees and then "issuing payments to the order flow providers." *Id.* ¶ 28; *see also id.* ¶ 30 (conceding that PFOF fees are not "Exchange revenue").

When confronted with the Exchanges' motion to dismiss, however, Plaintiffs—having already effectively amended their Complaint by dismissing and re-filing this action—again seek to run away from their own allegations. They now argue that the Exchanges acted "improperly" by "(mis)charging fees for the purpose of increasing trading volume," "took money that belongs to Plaintiffs," and "refuse to give it back." D.E. 30 ("Opp.") at 1, 11, 23; *see also id.* at 4, 6, 12, 16. These allegations are not in the Complaint, notwithstanding the clear rule that a "complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Plaintiffs' attempt to amend their Complaint (again) through briefing is both improper and unavailing.

*First*, even if Plaintiffs had alleged "willful and grossly negligent" conduct (Opp. 16), their remedy would lie with the SEC under the Exchange Act. Whether exhaustion is required depends only on whether the challenged conduct is subject to review by the SEC. Although Plaintiffs claim that the SEC is powerless to address the allegedly mischarged fees, it has ample authority to impose sanctions for violations of the Exchanges' own rules and the Exchange Act, *see* Order at 5, and to enforce compliance through suit. Because Plaintiffs could have pursued

their grievance before the SEC under the Exchange Act, but did not do so, their Complaint should be dismissed for failure to exhaust the remedy that Congress provided.

*Second*, whatever label Plaintiffs apply to their claims, those claims are barred by absolute immunity. Plaintiffs assert that the PFOF programs were adopted to serve the Exchanges' own business interests, but why they were adopted is irrelevant. The Complaint challenges the Exchanges' conduct in *operating* their PFOF programs, and in particular their failure to discover the Subject Firm's mismarking. Market oversight and monitoring is quintessentially regulatory, and thus absolute immunity covers the conduct challenged here regardless of why PFOF fees were originally imposed. In any event, the PFOF programs were designed to "benefi[t] investors," Order at 2, and thus serve a regulatory purpose regardless of whether (allegedly) any Exchanges also had a profit motive for creating the programs.

*Third*, Plaintiffs' claims are barred by federal law. Plaintiffs fail even to acknowledge the D.C. Circuit's decision in *In re Series 7 Broker Qualification Exam Scoring Litigation*, which holds that "Congress created a self-contained process [in the Exchange Act] to review and remedy … complaints" about SRO actions, "rather than allowing plaintiffs to sue under common law theories." 548 F.3d 110, 114 (D.C. Cir. 2008). In addition, SEC-approved Exchange rules foreclose claims arising from the use of Exchange facilities. Plaintiffs would cabin these rules to claims relating to technological malfunctions, but that is not what the rules say. Plaintiffs cite regulatory history showing that claims for technological malfunctions were one purpose motivating adoption of the rules, but that history also demonstrates a broader purpose consistent with the rules' broad text: to foreclose the types of claims that Plaintiffs seek to assert here.

*Fourth*, and finally, Plaintiffs have failed to plead valid claims under Illinois law. Plaintiffs advance contradictory arguments in support of their state-law claims, simultaneously

asserting that Exchange rules are and are not contracts, and that the Exchanges have and have not retained the allegedly mischarged fees. Ultimately, however, Plaintiffs fail to explain why any of their various equitable causes of action plausibly could require the Exchanges to indemnify them for losses caused by the misconduct of the non-party "Subject Firm."

**ARGUMENT**

**I.      Plaintiffs Are Required To Exhaust Available Remedies Under The Exchange Act.**

The Complaint should be dismissed for failure to exhaust because Plaintiffs were required to raise their challenges before the SEC. The SEC has "plenary oversight and primary jurisdiction to remedy acts and omissions" of SROs, and alleged misconduct by SROs therefore must be "challenged at the SEC level." *Cook v. NASD Regulation, Inc.*, 31 F. Supp. 2d 1245, 1248-49 (D. Colo. 1998); *see also* D.E. 26 ("Mem.") at 9-12 (collecting cases). Indeed, the Third Circuit dismissed a case for lack of exhaustion in the analogous situation where an SRO member challenged the "propriety of the application" of a rule governing fee allocation—in that case, attorney's fees. *PennMont Sec. v. Frucher*, 586 F.3d 242, 247 (3d Cir. 2009). "[O]nce the [SRO] sought to enforce" the rule, the member "decided not to seek SEC review and went straight to the District Court," and its failure to exhaust warranted dismissal. *Id.* at 246.

Contrary to Plaintiffs' contention (Opp. 13), the SEC has ample authority to address their challenges. This Court has already determined that Plaintiffs seek to enforce the Exchanges' "duty to follow their own PFOF program rules," and federal law provides the SEC with numerous means to ensure that the Exchanges comply with these "duties … imposed by the Exchange Act." Order at 5; *see generally* Mem. 11 (citing relevant provisions). As the Fifth Circuit explained in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*, "the SEC is authorized to take direct action against the [SRO] to ensure that the [SRO] enforces its own rules," and "may seek an injunction in district court." 616 F.2d 1363, 1367-68 (5th Cir. 1980);

*see also Swirsky v. NASD*, 124 F.3d 59, 62 (1st Cir. 1997) (same). Plaintiffs seek to minimize

these remedies on the ground that they do not involve formal adjudication (Opp. 13), but this

attempt fails for two reasons. *First*, when the SEC seeks injunctive relief in federal court, it most

certainly does involve "formal adjudication." *Second*, even if it did not, that would not give

Plaintiffs license to ignore Congress's choice to vest enforcement responsibility with the SEC.

Plaintiffs also express dissatisfaction because, they hypothesize, "simply 'complaining'

to the SEC would not lead to the recovery of the wrongly charged fees." Opp. 14 n.14. If the

SEC were to agree with Plaintiffs that Exchange rules require the Exchanges to indemnify

Plaintiffs for the mischarged fees, the SEC could compel the Exchanges to do so. Plaintiffs may

be concerned that the SEC would determine that indemnification is not required, but that

possibility serves only to illustrate the importance of allowing the SEC to bring its expertise to

bear. Regardless of the SEC's ability to compel recovery of the allegedly mischarged fees,

Plaintiffs' "disenchantment" with the remedy that Congress selected would "chang[e] nothing,"

as they are entitled only to the remedy that Congress chose to provide. *Series 7*, 548 F.3d at 114-

15; *see also infra* Part III.A.[1]

Nor is there any merit to Plaintiffs' suggestion that exhaustion is required only where the

challenged SRO conduct is regulatory in nature. The only authority Plaintiffs cite for this

purported limitation—a single paragraph from *Opulent Fund L.P. v. NASDAQ Stock Market,*

*Inc.*, No. C-078-03683, 2007 WL 3010573 (N.D. Cal. Oct. 12, 2007), *cited in* Opp. 11-12—is

plainly inapposite. The court believed that, although the "SEC has jurisdiction to review alleged

---

[1] In *Marquis v. U.S. Sugar Corp.*, cited by Plaintiffs (Opp. 14), the district court declined to require an employee to exhaust his claim with the Labor Department because the employer's "[c]ompliance with the [relevant] regulations" was "voluntary." 652 F. Supp. 598, 600-01 (S.D. Fla. 1987). SROs, by contrast, are required by federal law to comply with their own rules.

violations by an SRO when the SRO has acted in its regulatory capacity," the SEC lacks

jurisdiction over "SRO conduct falling outside of the SRO's regulatory functions." *Id.* at *6.

But the Exchange Act expressly permits the SEC to sanction an SRO that has "violated … its

own rules," 15 U.S.C. § 78s(h)(1), and thus SEC oversight extends broadly to an SRO's rule-

based conduct—whether any specific instance is deemed "regulatory" or not. Because violation

of the Exchanges' rules is precisely what Plaintiffs allege, this argument gets them nowhere.

Exhaustion "allows the [SEC] to utilize its discretion, apply its expertise, correct its own

errors, and handle its business expeditiously." *Merrill Lynch*, 616 F.2d at 1370; *see also*

*Swirsky*, 124 F.3d at 62-63 (same). Plaintiffs did not afford the SEC an opportunity to address

their concerns before bringing suit, and their Complaint accordingly should be dismissed.

## II.     The Complaint Is Barred By Absolute Immunity.

The Complaint also should be dismissed because the conduct Plaintiffs challenge falls

squarely within the scope of the Exchanges' absolute immunity.

### A.     Defendants' Market-Monitoring Activities Are Regulatory In Nature.

Plaintiffs raise questions about the Exchanges' reasons for *adopting* the rules governing

their PFOF programs, claiming that those programs were not created for a regulatory purpose.

But Plaintiffs "do not seek to rescind the PFOF fee schedules, much less the entire PFOF

Program." Opp. 25. Instead, their allegations are that the Exchanges mistakenly enforced their

rules and collected fees not owed, "fail[ed] to detect the mischarging" by the Subject Firm, and

failed to provide what Plaintiffs view as an appropriate regulatory response upon discovering the

Subject Firm's misconduct. *Id.* at 16; *see also* Order at 2-3 (describing Plaintiffs' allegations).

Whatever the reasons for adopting the PFOF programs—and they were indeed regulatory in

nature, *see infra* Part II.B—the Exchanges' conduct in monitoring the markets for rule violations

and addressing the Subject Firm's misconduct lies at the heart of their regulatory responsibilities.

Absolute immunity applies whenever an SRO exercises its "responsibility of monitoring its market." *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1215 (9th Cir. 1998). When a case challenges an SRO's alleged "fail[ure] to monitor … compliance" by market participants, it implicates the SRO's regulatory functions and immunity attaches. *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 106 (2d Cir. 2001). Indeed, in a case involving allegations that an SRO failed to prevent misconduct by market participants, then-Judge Sotomayor explained that "action or inaction with respect to trading on the Exchange" is "indisputably" a regulatory function. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 99 (2d Cir. 2007); *see also* Mem. 12-16.

Rather than address the authorities cited in the Exchanges' memorandum of law, Plaintiffs attack the Exchanges for failing to cite three other cases. *See* Opp. 5-11. Those cases stand for the undisputed proposition that courts draw a line between immune and non-immune conduct. But the relevant question for this Court is not whether there is a line, but rather on which side of the line the conduct challenged here falls. *See* Mem. 12-13. Plaintiffs' cases are unhelpful in answering that question because they involve conduct far afield from the allegations here; to the extent those cases are relevant at all, they support the Exchanges.

*Weissman v. NASD, Inc.* involved "advertisements that promote the sale of a particular stock and serve no regulatory function whatsoever," and that were "in no sense coterminous with the regulatory activity contemplated by the Exchange Act." 500 F.3d 1293, 1297, 1299 (11th Cir. 2007). There is a compelling difference between paid advertisements addressed to the general public and alleged to promote a particular stock (as in *Weissman*) and the conduct at issue here: enforcing Exchange rules imposing fees on market participants, monitoring market participants' compliance, and remedying misconduct after its discovery.

Plaintiffs once again cite *Opulent*, misleadingly suggesting that the case involved a "pricing (*i.e.*, fee) schedule." Opp. 12. In fact, *Opulent* involved calculating the value of an index for trading purposes (akin to the Dow Jones Industrial Average or the S&P 500). 2007 WL 3010573, at *5. The court concluded that operation of the index was a business activity separate from regulation of the exchange, and specifically emphasized that operating the index did not "involve oversight of the market." *Id.* The opposite is true here.

Finally, Plaintiffs rely on *In re Facebook Inc., IPO Securities & Derivatives Litigation*, which concluded that the "promotion and design of business systems," such as an exchange's electronic trading system, is non-regulatory. MDL No. 12-2389, 2013 WL 6621024, at *16 (S.D.N.Y. Dec. 12, 2013), *appeal pending*, No. 14-632 (2d Cir.). But the court *also* determined that decisions and statements concerning the operation of those systems during trading are regulatory, and thus immune. 2013 WL 6621024, at *17, *20. Whatever the merits of the line drawn in *Facebook* between immune and non-immune conduct, the conduct in this case would fall on the side that the court determined *was* immune. Plaintiffs' claims concern alleged "misadministration" of the PFOF rules during trading (Opp. 4), not the design of PFOF programs. Like the conduct that *Facebook* concluded was regulatory, the Exchanges' responses to the Subject Firm's misconduct could "potentially cause loss to one or another group of market participants" by determining where losses resulting from that misconduct should fall, and they are therefore "quintessentially regulatory" under *Facebook*. 2013 WL 6621024, at *15, *17.

Although Plaintiffs now try to characterize their claims as somehow limited to the purposes of PFOF fees, they allege a failure in the Exchanges' market oversight and enforcement with respect to the Subject Firm, and absolute immunity thus bars their claims.

      **B.**      **The PFOF Programs Fulfill A Regulatory Purpose.**

Even if the relevant issue were adoption of the PFOF programs, rather than their administration, absolute immunity would still bar Plaintiffs' claims. Plaintiffs assert that "efforts to attract order flow serve a business function," and cite an SEC concept release for the proposition that "pressure to attract order flow" may create a conflict among SROs' various functions. Opp. 7 n.8. But that release did not address PFOF programs. When the SEC *did* address PFOF programs—in a separate release that same year—it explained that they equitably apportion costs among market participants and ensure that "market makers that may trade with customers on the exchange contribute to the cost of attracting that order flow." Concept Release, Competitive Developments in the Options Markets, 69 Fed. Reg. 6124, 6129 (Feb. 9, 2004). Exchange-operated PFOF programs avoid potential inequities that might arise when PFOF fees are paid by specialists directly, as a "specialist on an exchange where its role is less dominant … cannot, on its own, pay as much for order flow." *Id.* This purpose—ensuring that the markets operate more equitably—places the PFOF programs squarely "within the scope of the [Exchanges'] regulatory and general oversight functions." *D'Alessio*, 258 F.3d at 105.

In addition, as this Court has already concluded, the PFOF programs "increas[e] market liquidity and benefi[t] investors." Order at 2. The SEC has identified "market liquidity and pricing efficiency" as "important benefits" for investors. Proposed Rule: Amendments to Regulation SHO, 74 Fed. Reg. 18,042, 18,044 (Apr. 20, 2009). Thus, regardless of whether the PFOF programs also "enhance[d]" the Exchanges' "ability to compete profitably" against each other (Opp. 6), the fact that these programs improve liquidity establishes that adoption of the programs was "consistent with the quasi-governmental powers delegated to [the Exchanges] pursuant to the Exchange Act," *D'Alessio*, 258 F.3d at 106, which makes the Exchanges immune.

Plaintiffs argue that any conduct allegedly designed to "increase trading volume" is a "competitive business function" and thus not protected by immunity. Opp. 7. Their own cases, however, say precisely the opposite. The plaintiffs in *Facebook* argued that statements made during trading were not regulatory because they "generated profit and advanced [the defendant's] business interest." 2013 WL 6621024, at \*21. But the court disagreed, emphasizing that the alleged profit motive was "not the determinative inquiry." *Id. Opulent* similarly explained that "[t]he immunity inquiry turns on the nature of the challenged conduct, not its profitability," 2007 WL 3010573, at \*5 n.1, and *Weissman* rejected a "test" that would look to "an SRO's subjective intent or motivation," 500 F.3d at 1297.

At a high level of generality, *any* regulatory decision could be characterized by a plaintiff as motivated to "increase trading volume" or improve the SRO's "competitive[ness]," and market regulators are well aware that sound and effective regulation will ultimately attract additional market participants. But the immunity doctrine "'accords protection from … any judicial scrutiny of the motive for and reasonableness of official action.'" *NYSE Specialists*, 503 F.3d at 98 n.3 (citation omitted). For the immunity doctrine to apply, it is sufficient that the challenged actions were "within the ambit of the [Exchanges'] delegated power," *id.* at 99—as here—regardless of whether there might have been a profit motive for acting, *see*, *e.g.*, *Sparta Surgical*, 159 F.3d at 1215 (applying absolute immunity notwithstanding plaintiff's allegation that the SRO was acting as a "market facilitator" to promote its own business). A different rule would reduce absolute immunity to a mere pleading hurdle, to be overcome whenever a plaintiff shouted "profit" or "trading volume." That is not the law.

## III.    Plaintiffs' Claims Are Barred By The Exchange Act And The Exchanges' Rules.

Plaintiffs' claims also fail because they conflict both with the pervasive federal regulation and oversight of the Exchanges and with the Exchanges' SEC-approved rules.

**A.     The Exchange Act's Comprehensive Remedial Structure Precludes Plaintiffs' Common-Law Claims.**

"[R]ather than allowing plaintiffs to sue under common law theories, Congress created a self-contained process [in the Exchange Act] to review and remedy … complaints" that SROs are not fulfilling their regulatory duties. *Series 7*, 548 F.3d at 114. Having adopted a reticulated system of review involving the SEC and federal courts of appeals, Congress "did not intend the regulatory duties [of SROs] to be enforced by common law causes of action." *Id.* at 115; *see also Sparta Surgical*, 159 F.3d at 1215 (same).

Apparently unable to muster any meaningful response to *Series 7*, Plaintiffs simply ignore it. Instead, Plaintiffs rely (Opp. 17-18) on *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), which involved the Home Mortgage Assistance Program—a federal statute with no resemblance to the Exchange Act's comprehensive regulatory structure. *Wigod* held that the absence of a federal cause of action, standing alone, does not preclude an action under state law. *Id.* at 581. But that is not the argument the Exchanges make here. *See* Mem. 16-18. Instead, they rely on the structure of the Exchange Act: As *Series 7* explains, "[t]he *multiple layers of review* evince Congress's intent to direct challenges" to SRO action "to the avenues Congress created." 548 F.3d at 114 (emphasis added). If Congress had "been silent on this issue," as in *Wigod*, then "a more plausible case for common law suits might be made. But its clear designation of an appellate process shows a contrary intent" in the Exchange Act. *Id.*

Moreover, *Wigod* emphasized that the absence of a federal cause of action may be sufficient *on its own* to foreclose state-law claims where the plaintiff alleges that a defendant "violat[ed federal] guidelines." 673 F.3d at 585. As this Court has recognized, "there can be no doubt" that Plaintiffs are trying "to enforce defendants' duty to follow their own PFOF program rules," and "[t]hose duties are imposed by the Exchange Act." Order at 5; *see also Series 7*, 548

10

F.3d at 115 (rejecting claims seeking to enforce "duties [that] arise only under the Exchange

Act"). Because Congress provided that the duties it created in the Exchange Act would be

enforced by the SEC rather than private parties, Plaintiffs' claims also fail under *Wigod*.

> **B.      Plaintiffs' Claims Are Barred By Exchange Rules.**

Plaintiffs' claims are also foreclosed by the Exchanges' SEC-approved rules, which

provide that the Exchanges shall not be liable to their members for losses arising from the use of

their facilities. *See* Mem. 18-19. Plaintiffs contend (Opp. 15) that those rules are "limited to

claims relating to the Exchanges' equipment, utilities and computer systems," but that is not

what the rules say. ISE's rule, for example, applies to any loss "arising out of the use of the

facilities, systems or equipment" of the Exchange. Mem. Ex. J; *see also* Mem. Exs. I-M

(similar). The separate references to categories such as "facilities," "systems," and "equipment"

confirm that no one word refers only to computer systems. Moreover, the Exchange Act's

definition of an exchange "facility" further supports the broad scope of that term, including "any

service … for the purpose of effecting or reporting a transaction on an exchange." 15 U.S.C.

§ 78c(a)(2). The PFOF fees were imposed as a result of Plaintiffs' "use of the [Exchanges']

facilities" to execute trades, and thus this lawsuit "arises out of" that use.

In support of their interpretation, Plaintiffs rely on state-law cases holding that

exculpatory clauses in contracts must be "strictly construed." Opp. 15. But SRO rules are

creatures of federal law. *See* 15 U.S.C. § 78s(b)(1). Moreover, Plaintiffs have not cited any

federal authority for narrowly construing the specific rules at issue here or SRO rules in general.

Instead, the unambiguous language of the rules should be enforced.

Plaintiffs also pluck statements from the regulatory history expressing concern that

computer systems could give rise to liability. That history, however, indicates only that

computer systems were *among* the concerns motivating the rules. While the release for CBOE,

11

for example, refers to the need for liability limitations to protect "innovative systems and procedures," it also broadly states that "[t]he purpose of the [rule] is to limit the liability of the Exchange should any of its members incur losses as a result of [its] use of Exchange facilities." 43 Fed. Reg. 22,471 (May 25, 1978). The release for NASDAQ explains generally that "establishing a rule that limits liability … may reduce non merit-based or vexatious legal proceedings … by member litigants and help protect against the Exchange's resources being unnecessarily diverted." 74 Fed. Reg. 59,279, 59,281 (Nov. 17, 2009). Far from being limited to computer systems, the rules were intended (and thus worded) broadly to bar attempts to hold Exchanges liable as insurers for their members for every loss that might be incurred as a result of participation in the markets—precisely what Plaintiffs attempt to do here.

Finally, Plaintiffs are wrong to contend that they can circumvent these rules based on assertions in their opposition that the Exchanges engaged in "misconduct … that is both willful and grossly negligent." Opp. 16. To the contrary, Plaintiffs affirmatively pleaded that the Exchanges charged PFOF fees as a result of the *Subject Firm*'s misconduct. *See* Compl. ¶¶ 6, 35-41, 72. Even now, Plaintiffs assert elsewhere in their opposition that the fees were "charged and paid due to a mistake." Opp. 24. Plaintiffs not only failed to allege willful or grossly negligent conduct; they pleaded the opposite and cannot change that position in their opposition.

## IV.     Plaintiffs' Common Law Claims Should Be Dismissed.

Plaintiffs' claims also fail as a matter of state law. *See* Mem. 20-25. Despite asserting that the PFOF rules and fee schedules constitute an "agreement," Plaintiffs did not plead a breach-of-contract claim. *See id.* at 20; *see also* Compl. ¶¶ 24, 62-66. To be sure, any contract claim would have been futile because there are no private rights of action against SROs for allegedly failing to follow their rules. *See supra* Part III.A; *see also* Mem. 16-18. But Plaintiffs' failure to identify any relevant legal right—contractual or otherwise—on which they could

12

recover from the Exchanges is independently fatal to their state-law claims. That is particularly true because the Exchanges acted as intermediaries in administering the PFOF programs; they did not retain any money that purportedly belongs to Plaintiffs. There is no basis for allocating any loss to the Exchanges under these circumstances, and the various state-law equitable theories that Plaintiffs invoke cannot adequately be pleaded here.

**A.** Declaratory Judgment (Count I). The Complaint does not identify any substantive rights or duties that could be the subject of a declaratory judgment. Mem. 20. Plaintiffs seek to fill that void by invoking a "right based on the Exchanges' agreement to only charge PFOF Fees for those orders that are part of the PFOF Programs" (Opp. 19 & n.20), but have not identified any authority holding that misapplication of SRO rules adopted under the Exchange Act can give rise to a "right" enforceable under state law. In any event, the Complaint does not allege an "agreement" to indemnify Plaintiffs for losses caused by the mismarking of orders by other market participants, and thus there is nothing for the Court to "declare." *See* Compl. ¶ 24.

**B.** Accounting (Count II). Plaintiffs do not explain what purpose an accounting could have in the absence of some viable theory under which they are owed money *by the Exchanges*. *See* Mem. 21. Plaintiffs claim (Opp. 20) that no such theory is required, but in their sole cited authority, the defendant was a fiduciary "in possession of the records and accounts … which would reflect the amounts of funds he possessed which belonged" to the plaintiff. *People ex rel. Hartigan v. Candy Club*, 501 N.E.2d 188, 190 (Ill. App. Ct. 1986). In contrast to *Hartigan*, Plaintiffs concede that the Exchanges do not possess Plaintiffs' funds. *See* Compl. ¶ 30.

**C.** Promissory Estoppel (Count III). A party cannot simultaneously allege the existence of a contract and pursue a claim for promissory estoppel. *See* Mem. 21-22. Plaintiffs assert (Opp. 22) that they have not pleaded "the existence of an express contract," but they specifically

alleged that the rules are an "agreement," Compl. ¶ 24, and their opposition is replete with claims

that the PFOF rules constitute a "contract," Opp. 15 n.16, 18 n.19, 19 n.20, 20 n.21.  To be sure,

the Exchanges do not agree with Plaintiffs' characterization of these rules, but it is Plaintiffs'

burden to plead facts establishing a plausible theory for recovery.  Their contradictory allegations

cannot satisfy that burden.[2]

Nor do Plaintiffs point to any allegation that the Exchanges promised to bear the cost of

fees on orders mismarked by third parties.  *See* Mem. 22.  Nothing in the PFOF rules addresses

the allocation-of-loss issue.  Plaintiffs attempt to shift the pleading burden, claiming that "[t]he

Exchanges fail to cite … a single case to support their proposition that this so-called omission

renders the fee schedules ambiguous."  Opp. 21.  But the question is not ambiguity; it is whether

the alleged promise addresses the supposed obligation at all.  It is Plaintiffs' burden to plead a

promise that is "unambiguous in its terms," *Camosy, Inc. v. River Steel, Inc.*, 624 N.E.2d 894,

898 (Ill. App. Ct. 1993), which they have failed to do.

**D.**  Restitution (Count IV).  Plaintiffs deem it "irrelevant" (Opp. 23) that the Exchanges

"distributed the PFOF Fees to order flow providers," but Illinois law is clear that restitution is

available only when property has been "unjustly retained," Mem. 23 (citing cases).  In contrast to

*Raintree Homes, Inc. v. Village of Long Grove*, where the plaintiff sought "restoration of the sum

of money in the possession" of the defendant, 807 N.E.2d 439, 445 (Ill. 2004), the Exchanges

"retained" nothing here, let alone "unjustly," *see*, *e.g.*, Compl. ¶ 30.  Plaintiffs' new argument—

---

2  Plaintiffs state in passing that "[t]o the extent this Court concludes that Plaintiffs have alleged
the existence of an express contract, Plaintiffs seek leave to amend the Complaint to include a
claim for breach of contract."  Opp. 22.  But Plaintiffs have already had two bites at the apple,
and in any event their suggested third bite would be futile.  *See supra* at 12.

14

"that the Exchanges took money that belongs to Plaintiffs and refuse to give it back" (Opp. 23)—

is completely at odds with the Complaint.

      **E.** <u>Rescission</u> (Count V).  Plaintiffs seek to rescind "the transactions by which they were

mistakenly charged PFOF fees."  Opp. 24.  But rescission allows a party to rescind a contract,

not a "transaction."  *See* Mem. 24.  The mere payment of fees, by itself, is not a contract, and

Plaintiffs do not allege otherwise.  Yet Plaintiffs also insist (Opp. 22) that they do "not allege the

existence of an express contract," and disclaim (*id.* at 25) any desire to rescind the purported

"agreement" in the fee schedules.  Absent any relevant contract to which rescission could apply,

this cause of action fails.

      Nor do Plaintiffs explain how the Exchanges could be returned to the status quo if they

were required to "refund" fees that they have already passed to third parties.  *See* Mem. 25.

Plaintiffs assert (Opp. 25 n.24) that the Exchanges "recovered transaction fees" from the Subject

Firm in disciplinary proceedings, but the Complaint does not allege that those "transaction fees"

included any refund of PFOF fees.  *See* Compl. ¶¶ 33-34.  Indeed, the Complaint specifically

distinguishes "transaction fees" from PFOF fees.  *See id.* ¶ 30.  Plaintiffs would force the

Exchanges to use unrelated monies to "refund" the PFOF fees, but that would simply shift any

loss onto the innocent Exchanges, not restore the status quo.

## CONCLUSION

      For all the reasons set forth herein, and in the memorandum of law in support, the motion

to dismiss should be granted.

15

Date:  April 16, 2014                                              Respectfully submitted,


 /s/ David J. Chizewer                                           /s/ Paul E. Greenwalt
David J. Chizewer                                             Paul E. Dengel
GOLDBERG KOHN                                                 Paul E. Greenwalt
55 East Monroe Street                                         SCHIFF HARDIN LLP
Suite 3300                                                    233 South Wacker Drive
Chicago, IL  60603-5792                                       Suite 6600
Phone:  (312) 201-3938                                        Chicago, IL  60606
                                                              Phone:  (312) 258-5600
Douglas W. Henkin
Nicole Fidler                                                 *Attorneys for Defendant Chicago Board*
MILBANK TWEED HADLEY & MCCLOY LLP                             *Options Exchange, Incorporated*
1 Chase Manhattan Plaza
New York, NY  10005-1413
Phone:  (212) 530-5000                                         /s/ Terrence P. Canade
                                                              Terrence P. Canade
*Attorneys for Defendants NYSE Arca, Inc.,*                   LOCKE LORD LLP
*NYSE MKT LLC, and International Securities*                  111 South Wacker Drive
*Exchange, LLC*                                               Chicago, IL  60606
                                                              Phone:  (312) 443-1862

                                                              Douglas R. Cox
                                                              Scott P. Martin
                                                              GIBSON, DUNN & CRUTCHER LLP
                                                              1050 Connecticut Avenue, N.W.
                                                              Washington, DC  20036
                                                              Phone:  (202) 955-8500

                                                              *Attorneys for Defendant NASDAQ OMX*
                                                              *PHLX LLC*